**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | |
|---|---|
| **DEMETRA D. RANDOLPH,** | * |
| Plaintiff, | * |
| v. | *    Case No.: GJH-17-2176 |
| **SENTRY MANAGEMENT, INC.,** | * |
| Defendant. | * |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

In this action, Plaintiff Demetra Randolph claims that her employer, Defendant Sentry Management, Inc., retaliated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* after she reported complaints of race and age discrimination. Pending before the Court is Defendant's Motion for Summary Judgement. ECF No. 19. No hearing is necessary. *See* Loc. R. 105.6 (Md.). For the following reasons, Defendants' Motion for Summary Judgment will be denied.

**I.  BACKGROUND[1]**

Sentry Management is a corporation that manages homeowners and condominium associations. ECF No. 19-3 at 2.[2] Randolph began her career with Sentry as a Community Association Manager in October 2012. ECF No. 2 ¶ 9; ECF No. 8 ¶ 9. Sentry promoted Randolph in June 2013 to the position of Assistant Division Manager of its Crofton, Maryland office. *Id.* ¶¶ 10–11. The promotion was based, in part, on the fact that people in the office

---

[1] Unless otherwise noted, these facts are either undisputed or viewed in the light most favorable to the Plaintiff.
[2] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

1

respected Randolph and "frequently" went "to her to get her advice." ECF No. 21-3 at 2. Additionally, Randolph's supervisor noticed that she had a good attitude and wanted to learn as much as she could. *Id.* In a press release announcing Plaintiff's promotion, her supervisor described her as having a "calm professional style." ECF No. 21-4 at 2. Plaintiff's promotion came with a pay raise. ECF No. 21-5 at 2. Randolph continued to perform well and receive praise in her new role, on February 6, 2014, she received ratings of "Excellent," "Very good," and "Good" on her performance review. ECF No. 21-6 at 2. As a result, she received another merit increase in her pay on February 9, 2014. ECF No. 21-7 at 2. Sentry again increased Randolph's pay in October 2014, ECF No. 21-8 at 2, and again received only "Excellent," "Very good," and "Good" ratings on her November 2014 performance review, ECF No. 21-7 at 2.

In late 2014, John Sheehy was hired to replace Randolph's former supervisor. ECF No. 2 ¶ 18; ECF No. 8 ¶ 18. After the change in supervision, Randolph received two additional pay increases in January and July 2015. ECF Nos. 21-10, 21-11.

Despite Randolph's success at work up to this point, the office was always tense and filled with drama. ECF No.21-12 at 3. Further, throughout her tenure, at least three employees complained to Randolph that they feared Sentry wanted to get rid of older workers. *Id.* at 6, 8. Then, around August 2015, Randolph began receiving complaints from colleagues that Sheehy was engaging in race discrimination. ECF No. 21-12 at 6, 8. According to Randolph, these colleagues came to her because they felt that she was "the only one" who would "stand up for" them, "talk for" them, and "try to help" them." *Id* at 6. Although Randolph had not heard Sheehy make racist comments, she believed he was making such harmful comments based on what

employees told her. *Id.* at 6, 13.[3] One employee told Randolph that Sheehy commented "that all black women [are] prostitutes." *Id.* at 13.

According to Sentry's personnel policies, the company "strongly urges the reporting of all incidents of discrimination, harassment or retaliation, regardless of the identity or position of the person who is engaged in the alleged conduct." ECF No. 21-13 at 4. Sentry's policies encourage employees to report concerns about "discrimination, harassment or retaliation" to "their immediate supervisor or any supervisor or manager of the Company or with the Company's Human Resources Manager and/or the Human Resources Department." *Id.*

On September 18, 2015, Dianne Voght, Sentry's Human Resources Manager, learned that two employees felt the office had become a toxic environment. ECF No. 19-11 at 2; ECF No. 19-4 at 1. Based on her conversations with these employees, Voght emailed the company's leadership including Howard Pomp and James Hart, advising that employees were concerned about a potential "mutiny in the MD office." ECF No. 19-4 at 1. She relayed that "[Sheehy] hasn't done anything" and that employees believe that "[Randolph] is stirring the pot because she wants [Sheehy's] job." *Id.* The email continued: "[Randolph] is meeting with all the employees individually and telling them that there will be a meeting (intervention) next week with [Sheehy] and she has a list of questions and he will answer truthfully and not lie and that there will be no retaliation." *Id.* Voght closed with: "Why can't they just do their jobs without all the drama and back stabbing?"

Later that day, Randolph emailed Voght and Sentry's President James Hart, identifying the issues that had been reported to her. ECF No. 19-6. She wrote that she had so far had a good

---

[3] In evaluating Defendant's Motion for Summary Judgment, the Court will not rely on Randolph's testimony about what employees told her for the truth of the matter asserted, but instead only to understand Randolph's state of mind when she complained to Sentry management about purported discrimination.

3

relationship with Sheehy and feared that her relationship with him, Voght, and Hart would change after she reported what she knew about purported "racial comments," "harassment and age discrimination" in the office. *Id.* In addition to the allegations of inappropriate racial comments and age discrimination, Randolph mentioned high rates of employee turnover, lost contracts, confusion regarding job responsibilities, and an overall tense office environment. *Id.* She expressed fear of retaliation again at the close of her email: "Again, I do not want to write this email. I fear retaliation for my actions of bringing this to your attention." *Id.* She also wrote, "I don't want [Sheehy] to know I wrote this email because it will wreck our working relationship and I feel that if it is made known, I will all of a sudden be given oral and written warning write ups and be terminated." *Id.*

Sentry leadership met with Voght to discuss the situation and decided that Pomp should visit the Maryland office to assess its condition. ECF No. 19-3 at 7. Pomp visited the Maryland office about a week later to meet with Sheehy, Randolph, and other individual employees. ECF No. 19-3 at 6. During his meeting with Sheehy, Pomp discussed the employees' concerns as well as leadership's frustration that the Maryland office had lost 20 accounts over the previous year. *Id.* at 6–7.

During his meetings with Sentry employees, several individuals mentioned that Sheehy could "speak abusively" and that he told one employee that she was dressed like a prostitute. *Id.* at 10–11. Based on what he learned from employees, Pomp personally concluded that while Sheehy made "unfortunate" comments, he was "not a racist." *Id.* at 12. Pomp and Human Resources then determined that employees were distrustful of their supervisors; while some were distrustful of Sheehy, others were distrustful of Randolph. ECF No. 19-10 at 7. Sentry leadership

felt that the management team in the Maryland office were taking steps to undermine one another. *Id.*

Despite Randolph's request that Sheehy not be made aware that she reported complaints, Pomp also met with Sheehy and Randolph together to discuss what Pomp perceived as their collective missteps. ECF No. 19-3 at 12. In front of Sheehy, Pomp expressed to Randolph "that the conversations she had independently with employees [were] undermining [Sheehy] and Sentry Management." *Id.* He continued, "I told [Randolph] that she wasn't to have any more conversations independently with employees [about Sheehy]" and that "if employees come in and they want to have conversations about [Sheehy], she needs to go and either take those concerns to HR or tell those employees to take those concerns to HR, or invite the employees to have [Sheehy] join them." *Id.* He told her that if she did not take this "corrective action" she would be fired. *Id.*

The following month, on October 1, 2015, Plaintiff received ratings of "Very Good" and "Good" on her performance evaluation. ECF No. 21-15 at 2. She received "Very good" ratings for her "cooperation/interaction with other employees" and her "cooperation with Supervisor." *Id.* Nevertheless, Sentry terminated Randolph on November 3, 2015. ECF No. 8 ¶ 31.

Pomp states that Sentry ultimately decided to fire Randolph after he spoke to four employees in mid-October who were "highly concerned and said that the issues continued and that [Randolph] continued to speak individually with employees, and [Sheehy] continued to have a temper, that they had concerns about working in the office and the overall environment in the office." ECF No. 19-3 at 13.

According to company policy, Sentry typically affords "some form of progressive discipline at the sole discretion of the Company to an employee who is subject to discipline,

5

unless the circumstances of the particular situation or incident warrant immediate discharge." ECF No. 21-13 at 4.

On November 5, 2015, Randolph filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission. 21-16. In its Position Statement to the EEOC, Defendant claimed it based the decision to terminate Randolph on "poor work performance and violations of the company harassment policy, as well as a reorganization of the Maryland office." ECF No. 21-17 at 2. On February 1, 2017, the EEOC issued its Determination that Sentry discharged Randolph "in retaliation for engaging in a protected activity in violation of Title VII of the Civil Rights Act of 1964, as amended." ECF No. 21-18 at 2. Randolph then filed suit in the Circuit Court of Maryland for Prince George's County, and Sentry removed the case to this Court on August 3, 2017. ECF No. 1.

## II. STANDARD OF REVIEW

Summary judgment is proper if there are no issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Francis v. Booz, Allen & Hamilton, Inc.,* 452 F.3d 299, 302 (4th Cir. 2006). A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 183 (4th Cir.2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, (1986)). A dispute of material fact is only "genuine" if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party. *Anderson,* 477 U.S. at 248–49. However, the nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985). The Court may rely on only facts supported in the record, not simply assertions in the pleadings, to fulfill its "affirmative

obligation . . . to prevent 'factually unsupported claims or defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987). When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson,* 477 U.S. at 255.

## III. DISCUSSION

Title VII prohibits discrimination against an employee in retaliation for the employee's opposition to illegal discrimination practices or participating in Title VII enforcement proceedings. *See* 42 U.S.C. § 2000e–3(a). Under the *McDonnell Douglas* framework, to successfully prove a claim, a plaintiff must demonstrate: "(1) she engaged in a protected activity; (2) the employer acted adversely against her; and (3) there was a causal connection between the protected activity and the asserted adverse action." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011). If a *prima facie* case is shown, the burden shifts to the employer to articulate a legitimate non-retaliatory reason for the adverse employment action. *Id.* If the employer meets this burden, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons but were in fact a pretext for retaliation. *See id.* A plaintiff meets the burden of demonstrating pretext by showing that the employer's proffered explanation is "unworthy of credence or by offering circumstantial evidence sufficiently probative of the issue of retaliation." *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004) (internal quotation marks omitted).

It is undisputed that Randolph (1) engaged in a protected activity when she reported complaints of age and race discrimination; and that (2) Sentry acted adversely against her when it fired her. *See* ECF No. 20-1 at 14. The sole dispute between the parties is over the third element: causation. To prove her retaliation claim, Plaintiff must establish but-for causation,

7

which requires "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar,* 570 U.S. 338, 360 (2013).

"[C]lose temporal proximity between activity protected by the statute and an adverse employment action may suffice to demonstrate causation." *Waag v. Sotera Def. Sols., Inc.*, 857 F.3d 179, 192 (4th Cir. 2017). Here, Randolph engaged in the protected activity by emailing Sentry regarding complaints of race and age discrimination on September 18, 2015. Sentry then terminated her on November 3, 2015. In between those dates, she was criticized for having the independent conversations with employees that led to her reports of discrimination. ECF No. 19-3 at 12. Viewing the evidence in the light most favorable to the Plaintiff, this timeline demonstrates close temporal proximity between the activity protected by Title VII and the adverse employment action and suffices to establish the third element of Plaintiff's *prima facie* case, causation.

Sentry claims that Plaintiff's work performance provides a legitimate, non-retaliatory reason for firing Plaintiff. But where a defendant articulates poor work performance as its legitimate reason for taking an adverse employment action, a conflict between performance reviews and testimony may serve as evidence of pretext. *See E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 408 (4th Cir. 2005) (denying summary judgment where the record included facts showing that the employer was pleased with plaintiff's overall job performance despite stating poor work performance as the reason for employee's termination). The record here contains evidence demonstrating that Sentry was pleased with Randolph's overall job performance. She routinely received positive feedback through her performance reviews and pay raises. *See e.g.*, ECF No. 21-5 at 2; ECF No. 21-6 at 2; ECF No. 21-7 at 2; ECF No. 21-8 at 2;

ECF No. 21-9 at 2; ECF No. 21-10; ECF No. 21-11; ECF No. 21-15 at 2. Only after Randolph engaged in a protected activity did Sentry leadership begin to articulate frustration with her work performance, and even still those frustrations do not appear on her performance evaluations. While Sentry leadership was apparently displeased with what it viewed as Randolph's attempt to undermine her supervisor Sheehy, ECF No. 19-3 at 12, Randolph's October 1, 2015 performance review rated her "cooperation with Supervisor" as "Very good," ECF No. 21-15 at 2. Even Sentry's argument that Randolph was poorly performing by "stirring the pot" and undermining Sheehy, ECF No. 19-4 at 1; ECF No. 19-10 at 7, could also support Plaintiffs' claim by suggesting that Sentry believed reporting complaints of discrimination to be synonymous with "stirring the pot."

Other record evidence also indicates that Sentry's articulated reasons for firing Randolph are pretextual. Specifically, viewing the facts in the light most favorable to Plaintiff, the record indicates that she was disciplined for following company policy. According to Sentry's personnel procedure, the company encourages employees to report concerns about "discrimination, harassment or retaliation" to "their immediate supervisor or any supervisor or manager of the Company or with the Company's Human Resources Manager and/or the Human Resources Department." ECF No. 21-13 at 4. There is evidence in the record that employees reported to Randolph instead of their direct supervisor or Human Resources Manager because they felt that she was "the only one" who would "stand up for" them, "talk for" them, and "try to help" them." ECF No. 21-12 at 6. Early in her career at Sentry, Randolph had been lauded as someone who was respected in the office and a person whom employees "frequently" went to for "advice." ECF No. 21-3 at 2. Despite her reputation and the company policy of allowing reporting to "any supervisor or manager," Pomp reprimanded Randolph for having

9

"conversations independently with employees." ECF No. 19-3 at 12. He also told her that if she continued to have one-on-one conversations about HR related concerns, she would be fired. *Id.* This potential conflict between the company's policy and its conduct towards Randolph, if believed, is indicative of pretext or serves as circumstantial evidence of retaliation.

Taken together, Sentry is not entitled to summary judgment because genuine disputes of material fact remain as to whether it terminated Randolph in retaliation for her opposition to race and age discrimination at work.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is denied. A separate Order shall issue.

Date: <u>December 28, 2018</u>   /s/_____
GEORGE J. HAZEL
United States District Judge